Llorca v. Sheriff of Collier County, Florida and I understand that you're also arguing the next case, Calderone, is that correct, together? Mr. Yormack? Yes, Your Honor. You may begin. May it please the court. My name is Benjamin Yormack and I represent the appellant Carlo Llorca and the appellants in the following case, Calderone. This case is about compensating law enforcement officers for the work that they do. It's about compensating them for their principal activities and it's about compensating them for activities that are integral and indispensable to their duties as law enforcement officers. As addressed extensively in the briefing in this matter, the district court failed to This case involves three issues, and when I say this case, that includes both cases because they're factually almost identical. The three issues are whether performing traffic enforcement while driving to and from their shift is compensable under these facts, whether donning and doffing specialized protective gear is compensable, and whether Florida law allows an employer who pays an employee nothing for some hours may borrow from other compensated hours and thus avoid minimum wage liability by virtue of averaging. Turning first to the travel time, courts have construed work to mean all activities controlled or required by the employer and pursued necessarily and primarily for the benefit of his employer and his business. Whether an off-duty activity meets that standard falls into whether or not the employee's time is being occupied by the employer, whether the employee actually has the freedoms associated with his individuality. If the employer knows that work is being performed, it's compensable. The Eleventh Circuit, this court, has made clear that not all work-related travel is non-compensable, meaning some travel time is compensable under certain circumstances. Both cases have a well-developed record that would establish to a jury that work is being from work. And that work is law enforcement. Let me ask you a clarifying question. Yes, Your Honor. Are you arguing that defendants failed to compensate the plaintiffs for the time actually spent responding to calls, or is your argument limited to, is your argument that all the travel time should have been compensable? We are not arguing that the time responding to calls is at issue here, because I believe the record reflects that they were compensated when they would come upon, say, an emergency situation like a traffic accident. But what each sheriff in Lee and Collier County has done is, excuse me, created a policy whereby the deputies have to be performing traffic cop duties while they're driving to and from their shift. And particularly in the Yorka case, where deposition testimony is present from Yorka's direct supervisor that says, essentially, they had to be traffic cops driving to and from their shift under my watch. Agency policy requires that. So, in evaluating the Yorka case, certainly the traffic cop duties that they're doing on the clock are thus the same duties they're doing off the clock, but they're not getting paid. If they're being compensated for the time when they actually stop and respond to a call or a traffic violation, then why is the other time when they're simply keeping their eyes open not a de minimis activity that would not be compensable? Sure. It's more than just driving. It's more than just keeping a radio on, which is what the regulation on point and the regulation the district court relied upon. This is not just drive to work, keep your radio on, and hey, if you come across a fatal accident or if somebody flags you down, we're not arguing that that's not compensable. I don't think the sheriffs are arguing that either. But what really turns this is that the same thing that these deputies are doing on the checks, any violations, running a stop sign, running a red light, these are all very common things. And the law enforcement officers here, particularly, as I said, in Collier County with the deposition testimony enlisted from Sergeant Lawson, it's the same duties they're doing on the clock, but they're just not getting paid off the clock. There really isn't a difference, and that's something that I believe Sergeant Lawson's testimony makes pretty clear. I thought that all they were required to do during the commute time was to keep the radio on and keep their eyes open so that if they saw an emergency, they would stop, or if they saw a safety violation, traffic violation, they would arrest the person. Not that they wouldn't be doing exactly the same thing they did on duty. When they're on duty, they're sometimes driving, but they're mostly, or at least largely, sitting, waiting at particular strategic points. And furthermore, it seems to me that merely keeping their eyes open is, it falls under that for purposes sentence, the sentence reads, for purposes of this subsection, the use of an employer's vehicle for travel by an employee and activities performed which are incidental to the use of the vehicle shall not be considered part of the employee's principal activities. And it seems to me these are incidental because it would be inconceivable for an officer in a uniform and in a marked patrol car to pass by an accident, or to pass by a safety violation like one of these cars sitting on the tail of another car. So it seems to me those are incidental, and all that they had to do is incidental. Where am I wrong? I think, Your Honor, the difference is, particularly in the record, the appellants in both cases are not making the argument that they were denied time when they did make traffic stops. But as noted in a footnote in the briefing, it's essentially the same line of logic like a football referee or a baseball umpire not doing work when they're not making an active call. They still are working. They're still doing the same thing. They're just not seeing a violation. So the traffic deputies, which cover all of them here, are doing work. You're not answering my question about why it's not incidental. And I think it is, I'm proposing that it may be incidental because it would simply be, it would be terrible public policy to have marked vehicles, marked sheriff's vehicles passing by blatant violations of traffic laws, would it not? It would be bad public policy, yes, Your Honor. And doesn't that therefore mean that it is, they can't do that, absolutely can't do that. Is that not incidental to the very use of the vehicle? I would agree that when it comes to severe, serious traffic infractions, accidents, absolutely I agree 100%, Your Honor. Lee County has a specific policy on point that says, you know, flagrant violations are to be enforced. If you're flagged down by a civilian, you need to stop. And of course, that's good public policy. But what the record in each case is, is that they're being asked to do more than just that. And that's where the crux of the argument comes in with the traffic. What is it they're being asked to do? They're being asked to enforce all traffic laws, not just flagrant violations, not just accidents. They're being asked to enforce all traffic laws, just like they are on duty, but they're That includes speeding. If you're going 10 miles an hour over the speed limit, the law enforcement should be pulling that person over, particularly in the Yorker case from the deposition testimony of Sergeant Lawson. So it's the appellant's respective position in both cases that because they're being asked to be traffic police off duty, which is the same principal activity they do on duty, that that time should be deemed compensable under the FLSA. So it's enforcing traffic laws during their commute? Yes, Your Honor. Not just something flagrant you're saying, or stopping for an accident. You're trying to contend it's doing whatever they would do after they get to work. Correct. In both cases, the record reflects the work being done on duty is actually the same as what they were doing off duty. And where does the record reflect that? Is it an affidavit or a deposition or what? In the Calderon case, it's four declarations from the named plaintiffs. In the Yorker case, it's the declaration of Mr. Yorker and the deposition testimony of Sergeant Lawson, his supervisor, that says that Yorker was required to be looking for traffic violations and enforce them while driving to and from his shift, and that that was off the clock, and that a deputy's failure to perform those tasks is grounds for discipline up to and including termination. Well, if you can be fired for it, you should be paid for it. And I think that that's the key. And that would be right in line with what Lee County's policy is, as Your Honor brought up with passing by a terrible accident or a flagrant violation. The deputy, when he comes upon that, would be paid for it. But by requiring them to be traffic police off duty, and then they're traffic police on duty, they're performing a principal activity of law enforcement, but they're just simply not getting paid for it. And I don't believe that's in keeping with the Fair Labor Standards Act. Are these named plaintiffs actually traffic patrol people, or are they other things like detectives or investigators? All were at one time. Schwing and Calderon were deputies. Zaleski was a detective at one time, and Selina Lee was in the traffic unit. You're talking about for the period of time they're seeking these wages. When they got to work, did they then go do traffic patrol? Yes, they did general patrol. Which includes, I'm sorry, not to dodge your question, Your Honor, but they did traffic as part of their regular duties. If they are not responding to calls for service, they're performing traffic enforcement. Did they get service calls while they were commuting? Yes, Your Honor. It's not limited to just what they saw, but they could be called to go someplace else and do something? They could in emergency situations, yes, but that would be the exception. Mainly they're driving and they're just looking for anything that might be either an emergency or a traffic violation. Correct. Does the record reflect their radar was on? This wasn't just simply what the regulation contemplates of listening to your radio as you drive in to work. The radar was on. They didn't have to do anything after roll call that they hadn't already done when they left their driveway. If I may switch gears to the second part of this, which is the donning and doffing claim. Obviously, if something is integral and indispensable to the primary duty, Supreme Court precedent says that that is itself compensable. It is the appellant's position in both cases that the donning and doffing of specialized protective gear is compensable under the FLSA. Specifically, this court in Bonilla v. Baker Concrete has three prongs to test whether or not it's an integral and indispensable activity. So first is whether the activity is required by the employer. Second is whether the activity is necessary for the employee to perform his or her duties. And third, whether the activity primarily benefits the employer. As discussed at length in briefing, there is a lot more to this than just simply putting on shirt and pants each day. The district court just summarily concluded that everything at issue here is just simply close and dismiss both cases on summary judgment. The gear that is in question here is indisputably in the record required by the employer. From the radio, the mace, baton strap, magazine pouch, handcuffs, holster, I could go on and on as to what's required, and I wouldn't mention shirt or pants. Both cases have the same record, essentially, that the employer is requiring the significant gear to be worn. And in both cases, there's evidence in the record that reflects how much time is actually required of these deputies. And it's a lot. This is not just like putting on, it probably took me five minutes to put my shirt, tie, and suit on this morning. But for these individuals, it takes a lot more. They have to hook a radio up. They have several firearms. They have to get their belt. They have to get other safety devices and have them all in place. That's all important because this is gear that is necessary for the job. Certainly, in Yorka's case, there was testimony that if you didn't have that stuff with you, you'd be sent home from roll call. Well, if you're sent home, that means you can't do your job. And if you don't have your gear, you can't do this job. If you don't have your handcuffs with you, for example, you can't apprehend suspects. If you don't have your vest on, you can't defend yourself properly. If you don't have your radio, you can't communicate. If you don't have your firearm, likewise, you can't defend yourself and dispel threats and keep the public safe. So it's the appellant's position in each case that the gear is indisputably necessary to the execution of their job as law enforcement officers. As to the third prong, whether it benefits the employer, certainly it does. Because the gear is necessary, it likewise flows that it benefits the employer. Here, because they're able to do the law enforcement activities with that gear, that allows the deputies to help fulfill the sheriff's mission to protect and serve, keep the public safe. The Second Circuit in Gorman and previous cases has held that even if it is indispensable, it still has to be integral. So merely because it's indispensable doesn't get you home. Is that not correct? It gets us on the way, but not home, Your Honor. I would agree with that. However, I think in this instance, it's also integral for the same reason that it's also indispensable. The law enforcement officers have to have these things. A law enforcement officer without their handcuffs can't contain a suspect. Same thing with all the other protective gear. Let me tell you what my major concern with your position is. It seems to me that this POTL Act needs to be interpreted in light of the purpose of the POTL Act, and that was to abrogate the earlier Supreme Court decisions which had interpreted this law in disregard of long-established customs, practices, and contracts. And it seems to me that it was a long-established custom that people would not be officers of the law, would not be compensated for dressing and undressing at home. And true, they have to pick up the belt with all of these other things on it, but that's part of getting dressed. And getting dressed at home was not, in any custom, compensated. Is Your Honor's question directed towards the location of the donning and doffing then? Yes. And in my understanding here, it is done at home. In each case, it was done at home. Neither sheriff's office provided facilities on site. That seems to me to be crucial and very unfavorable to your position. Well, certainly the Secretary's opinion of the Department of Labor does not help, but it also is not entitled to the Chevron deference. It would be entitled to a lesser deference. It's certainly reasonable, though, is it not? And it's certainly consistent with past custom. I don't necessarily think that it's unreasonable, but something can also be incorrect without making it unreasonable. I think that under the facts of the case and how modern law enforcement has developed, that the rule ought to be changed. And both cases provide an opportunity for that, potentially. Being required to do this much donning and doffing, certainly it's not de minimis by the record. It shows sometimes 30 minutes each day. I guess the real question is, why does it matter if it's done at home versus being done on premises? Arguably, particularly with the drive time issue, if they're performing law enforcement on the drive time as required in each of these cases, or at least as the record could reflect in each case, then they have to also be prepared. So the location of the donning and doffing in the appellant's position is immaterial. They still have to put all of this gear on. Is there any circuit case or case from the Supreme Court that's held that donning and doffing is compensable when it's done at home? I'm not aware of any specific case on point, Your Honor. My circuit case is pretty close on point, isn't it? It's close. Quite frankly, the case law is not well developed in this. There is a fairly close case. I'm forgetting the exact name of it, Your Honor. The City of Mesa. Yes. The issue here is that I don't believe the Ninth Circuit in that case got it correct, respectfully. I think that because of how much time is being required by these deputies, it's taking up too much time, and that gets us back to what the intent of the Fair Labor Standards Act is, a fair day's pay for a hard day's work. That decision is not in keeping with that. It is essentially robbing deputies of their free time and saying they're not going to get paid for it. Both appellants believe that that is unjust, unfair, and not in keeping with the intent of the Fair Labor Standards Act. I see that I am running out of time as to the issues regarding the minimum wage claims. Unless there are questions, I would defer to the briefing on that subject. Are you talking about the averaging, or are you going to come back to that? I am talking about the averaging, Your Honor, but I am also going to... I think you need to address that issue. I don't believe you can do it now, or the other side does this. You need some argument on the averaging. I would be happy to argue that now. The circuits have gone the other way. I want to hear what you have to say. Certainly, Your Honor. I don't know. I'm not opposed to that. Uh-huh. You're the other side on the first issue, and you're going to come back to the other? That's fine with me. Why don't you let them reply to all this? Thank you, Your Honor. May it please the court, counsel. My name is David Stephanie, and along with my colleague, Nicolette Bedarian, we have the privilege of representing the sheriff of both Collier County, Florida, and Lee County, Florida in these proceedings. Judge Hull, if I could just clarify. I have a set thirty minutes to address everything with you this morning. Are we saving the minimum wage argument for later, or do you want to hear from me on that issue? I just submitted it on the briefs, and I think the court needs to hear a little bit about it. That opens it up. Then I'll address it during my time, if that's all right, even though it's a little bit without oral argument. However, I don't want to do it. I just think it needs to be addressed. I'd be happy to address it. In fact, Your Honor, why don't I initially address the issue of the minimum wage claims? I really think it would be better because we're all thinking about the Donning and Daul. Okay. You go to that while it's fresh. I'd be happy to. So, Your Honor, I think based upon counsel's representation, there really are no significant fact issues here, and we are here on two summary judgment orders that were granted to the sheriffs in these cases. With respect to the specific issue of the commute time, we think the lower court specifically ruled correctly that the commute time in marked agency vehicles is not compensable working time under the Porter Reportal Act. The critical fact counsel just conceded, and certainly I think is presented in the briefs, is this is not an issue where the sheriff's deputies were not paid for their emergency stops or things that they did while commuting in off-duty status. That's not the issue here. Counsel has clarified that what they're trying to argue is that the deputies in these cases were engaged in law enforcement or traffic enforcement activities during the entire scope of their off-duty commutes. Therefore, it makes their off-duty commutes completely compensable, which is 100% contrary to the Department of Labor's regulations, and quite frankly, it's contrary to virtually every reported decision in the United States about the use of an agency vehicle, which is a common practice in many law enforcement agencies. Does the sheriff dispute the fact that they say their job coming into work is the same as their job after work? That is, they have general traffic enforcement. The radar needs to be on. It's not just emergency. I'm not saying that answers the question. Your Honor, the way you pose the question, the sheriffs do dispute that their job is exactly the same in an off-duty commute. All right, let's try it another way. They say in the declarations they have declared that they're supposed to do general traffic enforcement on the way to work with the radar on, looking around, not just for emergencies but for general traffic enforcement. Do you agree that's what they say they're required by the sheriffs to do? Your Honor, that's what their declarations say. That's not what the sheriffs require them to do. The sheriffs require them to have their eyes open, to have certain equipment on, such as their radio on. I know, but this is what their declarations say the sheriff requires them to do. I understand that that's what their declarations say. The difficulty is, Your Honor, and we brief this to the court, the operations manual and directives of both sheriffs in this case require the deputies themselves to report their own time worked, consistent with the regulations and directives that are given to them, and at the end of each work period, they work 14-day work periods at both agencies. At the end of those work periods, they have to certify, under penalty of discipline, that their actual hours worked are as reported in their timesheets. Some of them report their time electronically. They still call them timesheets for referring to them. What the appellants do in these cases, now by arguing that their whole commute time should have been time worked, is they evade reporting that. They never reported that their commute times were compensable work hours. In all the three years of the FLSA, applicable to each of their employment, or the five years applicable to their Florida Minimum Wage Act claims, they never reported that at all. Now they want to come back after the fact and change their timesheets and try to suggest that they were actually on duty, engaged in compensable work hours while they commuted in their agency vehicles from their home to their assigned district. What do the manuals say? What does the written policies say with regard to what their duties are during commutes? Your Honor, the specific policies are a little more articulate and detailed in the Lee County policies in the operations manual, and specifically, Your Honor, the context of asking deputies to not avoid flagrant violations. Those are language in the specific policies themselves. They actually help deputies by articulating four examples of the kinds of activities that they should pay attention to if they see it while they're commuting in an off-duty status. One of those examples in the specific directives is if they come upon a disabled vehicle. They're supposed to provide assistance until an on-duty sheriff's deputy can report and assist. Secondly, if there's a traffic accident, a motor vehicle accident that they come upon where there's no emergency vehicles yet there, they're supposed to attend to the motor vehicles and take action as appropriate, again, waiting until an on-duty officer appears on behalf of the sheriff's office. Additional opportunities are clearly if there's a flagrant violation of a traffic rule. Somebody's speeding 100 miles an hour going across through a red light. They're not supposed to just ignore that. That, again, makes good public policy sense. And then finally is the issue of traffic stops. There is some direction if they do a traffic stop for some flagrant violation that they're supposed to follow the same rules and procedures. Does the manual say flagrant violation? It does. I'm looking at the Collier County one. Do you know which section I should be looking at? Your Honor, I had it noted somewhere specifically. I mean, it sounds like you've got a lot you're supposed to be doing as you come into work for 15 minutes looking out for traffic violations. Well, Your Honor, I think there may be an overestimation as to how often these emergencies actually happen. The Collier County policy specifically, let me see. It's Chapter O-10, Section 1, which deals with the assignment and use of Collier County Sheriff's Office vehicles. So that's the specific section. Say that again, Chapter O? Chapter O-10, Section 1, which is the entitled assignment and use of CCSO vehicles. And I think, Your Honor, part of the overall picture here is while commuting in off-duty status, the deputies are not required to wear their full uniforms. They're required to have their photo ID with them and a badge and a firearm. That's at both agencies. So they don't have to have their full uniforms on, which again denotes that they aren't typically required to do the kinds of law enforcement or traffic enforcement that appellants contend that was part of their responsibilities in off-duty commutes. They've got to have their badge. Identification and badge, which does have a photo ID, Your Honor. They have to have their firearm, their issued firearm, and their badge showing that they're a certified officer. Those are the three things that the officers have to have in both cases. And Judge Hull, you asked specifically when the deputies and the appellants, the named appellants in this case, get to their roll call or get to the substation where they're assigned to work, do they then go off and do the same job? Well, that's not at all what they do. The road patrol deputies go back out and enforce, among other things, the traffic laws of the state and the county. But, for example, Mr. Zaleski, one of the appellants in the Lee County case, was a detective, and he had no responsibility for enforcing traffic laws in his capacity as a detective. He wasn't even required to wear a uniform, which is part of the donning and doffing. If you have one of these vehicles, I'm looking at the manual, you're on call 24 hours a day? Yes, in case of emergency, Your Honor. Okay. You're subject to being called, for example, if there's absences. You're not scheduled to work, but if there's a civil disturbance or something that requires an excess amount of manpower, the sheriff can call you in as part of an unneeded emergency supply of deputies. Okay. So you're talking about where the assigned vehicle shall be subject to call, either on view or remote. That's what you're talking about. Yes, and its section, at least in the Collier County, the subsection 2.2.4E, which defines routine commutes not being compensable, is the specific section where it addresses. That's in Chapter P.2, Section 2, just basically entitled Compliance with the FLSA. That's where the sheriff makes it clear that that routine commute is not compensable working time under the FLSA. Okay. The Lee County policies, since you asked, Your Honor, with respect to these things are in specifically Chapter 22.5.2.4. I think this is an important statement, completely belied by the declarations of the appellants in the Calderon case. Subpart F of that particular policy statement reads, and I quote, While off-duty, personnel are not expected to be strict traffic enforcers. However, they must not ignore flagrant violations which endanger life and or property or which could bring disrepute on the office. What section is that? 22.5.2.4, subparagraph F, as in Frank. At the end of that particular section is where the specific four examples of incidents requiring assistance from off-duty personnel operating marked agency vehicles comes into play. Again, those are the disabled vehicle, a motor vehicle collision, a walk-up complaint, and then a traffic stop caused by a flagrant violation. The policies, I think, are clear that it's intended that they keep their eyes open, listen to the radio, and counsel answered affirmatively to the question as to whether or not off-duty sheriffs are subject to being called while off-duty. The answer in both cases is no, generally, in the absence of some sort of serious emergency. The sheriff's office schedules deputies on various shifts that line up with each other so they have on-duty deputies to call to handle any emergencies that happen  The off-duty deputy who's commuting to work is not subject to being called until the end of roll call when they check in, and then they go online on the computer-aided dispatch system. To be clear and transparent, a deputy can offer to handle something by calling in. They are not allowed to do so unless they're authorized by dispatch. So they have the ability to call and take on something like, motor vehicle accident just occurred, I'll handle this. But if they do that, the policies are clear at both agencies. It's compensable work time. It goes down on their time sheets, and they get paid for it. And if they've worked more than 86 hours, they get overtime. Is that business about the flagrant, they cannot ignore flagrant, and not required to do strict? That's what you said. Strict traffic enforcement. Is that true in both counties? Your Honor, it's not as explicit in the Collier County Manual. I think it is handled the same way, but it's not as explicit an instruction in Collier County as it is in Lee County under the policies of the sheriff and the operations manager. There's nothing in the Collier County about that. I think it just talks specifically. Collier County just says deputies with assigned vehicles shall be subject to call either on view or remote. And the members shall be on call 24 hours a day, shall use their assigned vehicle with the radio on for all travel. They've got to keep the radio on if they're in the car. That's true, Your Honor. They are required to have the radio on in both agencies. And it says the users shall monitor their mobile or portable radios even while using the vehicles off-duty. That is true. That is what it says. But it doesn't get into, shall monitor their mobile or portable radios while off-duty. Okay, but that's not just keeping your eyes out, I guess. That's listening and responding to something. Well, I think it's listening, Your Honor, so that in the event that something comes across the radio that they happen to be very close to, that they could call in and communicate to dispatch, I'm right near that. And their declaration may say, I'm supposed to do general traffic, too. I don't see that in the manual. That's just in the declaration, I guess. Correct. And, Your Honor, just to focus in again on this issue of the commute time and moving on to the donning and doffing, just wrapping it up, the routine commute times are clearly encompassed by the scope of the Portable Portal Act's definition of preliminary and post-preliminary activities. The case decisions, as we cite in our brief, in the interest of time, I won't go through all those, but underscore that such routine commutes are not compensable working time under the FLSA. And again, the regulation specifically by the Department of Labor, 29 CFR section 553.221F, makes it very clear that having the radio on and operating an agency vehicle while commuting is not working and it's not compensable work time. This court has previously given Skidmore deference in the Bonilla case to these opinions and guidance of the U.S. Department of Labor and there's no reason to depart from giving Skidmore deference to the guidance here. So, Your Honor, we think that the routine commutes of sheriff's deputies in agency assigned vehicles are non-compensable activities, preliminary and post-preliminary activities, that are precluded from being compensable under the Portal to Portal Act and for that reason there's no violation presented by the appellant's claims for compensation for those activities in this case. With respect to the Donning and Doffing claim, these are claims that are, again, very well briefed by the parties. With respect specifically to the Donning and Doffing, there was some discussion in the appellant's argument specifically about the significance of the fact that the Donning and Doffing takes place at home and we rely on the Beaumont case, the City of Mesa case, the Ninth Circuit case in our brief, which is the only circuit court of appeal that has specifically addressed the issue of Donning and Doffing and it being compensable for law enforcement officers at the circuit court level that we're aware of. There's every reason, we believe, for this court to follow the holding of Beaumont and the City of Mesa case here. The facts are virtually on all fours with the Beaumont case. There the court was confronted with police officers who were issued uniforms and had the same kind of requirement to put on specific clothing as well as protective duty gear and a duty belt. You told us that there was no requirement that they have during the commute more than a badge, an ID, and a firearm. True, Your Honor. So they didn't have to put on all that other stuff. That's true, and I did not perhaps misspoke. I was talking specifically about the requirements of wearing a particular clothing and a duty belt while on duty when their shift started. That's what the facts in the Beaumont case, and specifically the police officers were not required to put on their clothing or their duty belt at any specific location. That was very significant to the Ninth Circuit, and they found specifically that being allowed to put on the uniform as an option at home made a great deal of difference and it made the activity of donning and doffing non-compensable under the Portable Portal Act. The Beaumont case came out before the Supreme Court's decision in integrity staffing. It did, Your Honor. And I wonder if Beaumont is entirely consistent with integrity staffing because integrity staffing said that the focus was on whether the activity was tied to the productive work that the employee is employed to perform. Yes, Your Honor, that was part of what integrity staffing held, and it's our position that applying the principles of integrity staffing to the context of these facts that the clothing and the duty belt is not an integral part of the job responsibilities of sheriff's deputies at these public agencies. But is the bright-line rule that Beaumont adopted consistent with integrity staffing? I think it can be, Your Honor, because specifically for the same reason, there's nothing unique. In other words, I think Beaumont really relied on that Abbey case from the Southern District of California, and its articulation that there's nothing special about donning an officer's uniform and the duty belt that requires that it be done at the employer's facility or premises. And so here, where there's no lockers available and the deputies are all putting their uniforms and stuff on at home, if that's what they choose to do, it's a step or two removed from their actual duties once their shift starts because they're putting on their clothes, then they're commuting off-duty in various lengths, intervals of time from wherever their homes are to the... But you just didn't... Go ahead. I was going to say, but it's necessary for the work that they do for them to put on the protective equipment. It is necessary for them to do once they're on duty, yes. But for me, the integrity staffing would indicate that it should be compensated. Your Honor, I don't see that it necessarily follows that way. Just simply because it's... You need to add this fact. You already conceded that they've got to answer calls when they're a call going, and so when they're commuting to work, they're subject to being... dealing with a traffic accident or answering a call, so they have to be fully dressed, not just badge and everything. They have to be in full regalia, so to speak. They have to have everything on because y'all require them, that is, the sheriff requires them, to answer calls on that way. So it's even more than integrity staffing here because during the commute, you're making them be subject to doing things. And in fact, you're paying them. So for doing that as on duty, so they have to be fully dressed, so to speak. Your Honor, specifically the... Fully in protective gear when they leave the house. In fact, when they get in that patrol car, because they're given the patrol car, they've got to have everything on. Isn't that correct? No, it's not, Your Honor. Well, how do they answer the calls? Well, let's try it this way. That's what their affidavits say. Let's try that. Do you agree that's what they say? I agree that that's what they allege in their declarations. But that's not what the policies say of the sheriff's office in either Collier or Lee County. I don't think it matters so much. We have an issue of fact, what the policy is. If they say this is what I'm told to do, then you have the policy. I don't know why it matters what the policy says versus what they say. Tell me why that matters. I think it characterizes the nature of the commute and the use of the agency vehicle. They have to have their badge, they have to have their photo ID, and their agency issued firearm. I'm talking about their declaration. Why isn't that just an issue of fact here as to what really the sheriff is requiring? You keep going back to what the policy says. They say that's not the policy. Here is what we are required to do. Yes, Your Honor. And in fact, Collier County, I'm not sure it even really specifically addresses what you have to have on when you jump in that car. The declaration, I agree with Your Honor's reading of the declarations of the Calderon plaintiffs in the Lee County case. That clearly, you know . . . They have to put on all protective gear and it's about ten items. They say they have to put on before they get in the car because they're subject to being on call to do patrol. That's what they argue out of their perhaps own understanding, but it's inconsistent with the sheriff's manual. It's a fact issue. I'm just asking that. Why isn't that a fact issue then? Because it is a fact issue. I don't think it's material because they can't be disciplined for not wearing their uniforms while they're commuting off-duty because our policy and manual clearly say they don't have to have their uniform on. If we think there is a difference between putting all of the gear on at home and having only to put the three items, ID badge and firearm on, then we would have to rule as to what the law is with respect to each and then send it back to the district court to determine what the facts are. Would that not be a fact issue if there's a difference? If there is a difference, you would, Your Honor, because there's not record evidence on how de minimis the time would have been to get your badge and your firearm and your photo ID. Obviously, they've got to at least put it in the car. They've got to have it with them. Yes, sir. With respect to my limited time left, I'd move on to specifically the... It makes no sense that they put it all in the backseat of the car and then they're on call. I mean, just common sense. But maybe I'm wrong. Well, some of the protective gear clearly on the list of things that are issued to deputies... Maybe the vest, bulletproof vest. They wouldn't put that on. They have to have that available in the car. Right, right. And some of the stuff is... Most of the stuff that is required is on a duty belt. Grab their belt and put it on. Right. And the evidence is quite varied in the record as to how long that takes. There's one affidavit that says it takes five minutes, and of course the appellants claim it takes 30 minutes. So... We argue that's not, again, a material issue of fact because it's not compensable either way with respect to the Port of Portal Act and its application here. Finally, just specifically on this issue of the minimum wage, if I could just address it from the briefs. This is, I think, as we noted in our letter brief that the court asked for, this is an issue of first impression, and that's whether or not the workweek averaging method is the proper methodology for determining compliance with the FLSA. Can I ask you a preliminary question? Yes, sir. If we conclude that the district code is correct, both with respect to commute and donning and doffing, then this averaging issue is moot, is it not? It is moot because there's no violation of the FLSA or the Florida Minimum Wage Act. So I would agree. Go ahead with respect to the averaging. Six of the 13 federal circuits who have considered the issue under this FLSA workweek averaging method have determined that that is, in fact, the proper way of analyzing minimum wage compliance by covered employers. As we noted in our letter brief, the Douglas case from the 9th Circuit in November of last year, after all the briefs were filed, has joined this unanimous chorus of the other five circuits and went through eight different reasons which time does not allow me to review with you here. But several of the reasons I think are significant, including the fact that the Department of Labor Interpretations established the workweek as the measuring rod for minimum wage compliance way back to 1940 and that this establishes a long history of interpreting a statute that has created reliance interests by the regulated employer community. This is, again, in part how the agencies here have determined their compliance with minimum wage over the course of the years at issue here. Courts overwhelmingly have followed this Department of Labor guidance in multiple cases throughout the years, and specifically Congress has done many revisions to the FLSA since 1940 in the face of these interpretations and has made no change whatsoever to how . . . Judge McEwen points that out. Is there anything in Judge McEwen's opinion that you disagree with? In the Douglas case, Your Honor? No, Judge McEwen for the 9th Circuit. I don't know the name of the case, the opinion she wrote recently. I think that's the Douglas case, if I'm not mistaken. There's really not anything that I disagree with and how the court analyzed that. She had the benefit of all these other cases. She seemed to do the most thorough. Yes, she did a better analysis than some of the cases on that specific issue. I just wondered if there was anything you disagreed with in Judge McEwen's opinion. No, Your Honor, I don't disagree with the nature of that decision and its applicability here. It's so interesting to me that they don't even come close, even if you take their maximum time of 30 minutes for Donna and Daphne, even if you take all the time they say and the like most favorable to the plaintiff and then you add it up and average it, they're still not anywhere close to a violation. Is that correct? That's correct, Your Honor. That's what we argued to the district court below in both cases. Right. Really, we don't have to decide the first two issues. We could just say, in any event, even if you take everything they say, it's correct. There's no averaging. I mean, you apply averaging and there's no violation. Correct. So, Your Honor, the specific . . . There wouldn't be anything to remand on that issue. I'm trying to say if you decided the last issue, you wouldn't have to remand for anything. Correct. Is that correct? I don't know. I'm asking. I don't think there's anything to remand if, again, the court finds no Donna and Daphne and no commuting time as compensable. No, I'm saying, let's say we'd say, assume for sake of argument, it's all compensable. It doesn't even come close under the averaging method to establish a wage violation. That's what I'm saying. Yes, Your Honor. I guess I would agree with that. Not with the former premise. I hope you don't decide that. Well, I'm just saying not decide it. You don't have to remand to get a . . . because some of those facts are in dispute. You don't have to do all that because, even if you take the like most favorable to the plan, say 30 hours, excuse me, 30 minutes for the Donning stuff, not 5 minutes, 10 minutes, 30 minutes, even if you take all the commute time, it's still well below what would get them to above . . . Clearly is, Your Honor, for the named appellants. Right. As you know, in the Calderon case, there was a class certification issue, which the court denied ultimately as part of his summary judgment decision and how the math works out for those other 58 or 50, whatever, number of additional deputies joined the FLSA case. Those are issues that I don't know how the math works for them. We did have a collective action that had a whole lot more people as part of the FLSA claim. Is that certification still extant? No, because the judge denied that they're . . . They're still part of the case, yes. They're still part of the case. What was denied was the class certification for the FMWA claims. Say that again. Judge Magnuson denied the motion for class certification of the FMWA, Florida Minimum Wage Act claims, finding essentially there were no violations, so there's no need to grant class certification. The additional deputies that joined the collective action are still part of the FLSA claim in the case. I don't know how math works for those additional deputies. We did not present that. In other words, some other plaintiffs have opted in. Correct. Additional plaintiffs. I see my time is up. Thank you, Your Honor. We would ask that the court affirm the judge's summary judgment decisions in favor of the sheriffs. Good morning again, Your Honors. Let me get to the minimum wage claim because that's where I had left off before. What counsel has told you is somewhat accurate, but what makes this case a little bit different is that it's the first opportunity, I believe, that a circuit court of appeals has had the chance to evaluate purely hourly employees with regard to the averaging. As the letter brief indicated, both sets of appellants here were paid purely hourly. The other cases, for example, the Olson case involved commissions, and as pointed out in the letter briefing, those commissions you can't tie to any one hour of work, and so thus in those situations it would make sense to average because you have to factor the commission across the entire pay period. But all of the other cases that have been decided have not been purely hourly employees. The recent Ninth Circuit case, I believe that the Ninth Circuit opinion made reference to the difficulty in trying to figure out what the pay structure was. There were all kinds of different pay structures by minutes, by hours, and I believe there was even one other metric used to determine compensation there as well. So it is the appellant's position that minimum wage violations here ought to be determined for purely hourly employees on an hourly basis. This gets us right in line with the Ninth Circuit case where essentially you can't... They have a pay period, and they submit the hours, and they're paid every two weeks. Is that correct? That is correct, Your Honor. Okay. Yes. There is a standardized pay period. It's every two weeks, and they get paid how many hours? It's 80-something... Law enforcement, it's 86, Your Honor. 86. If they work 86, then they're paid 86 times whatever. So there may be hourly, and they may go over the 86, but they still set up as an 86-per-hour two-week period. Is that not correct? Yes, it's an 86-hour pay period. The difference, though, is that the Fair Labor Standards Act makes reference to the pay period as bringing in the employees as subject to the act, but the Fair Labor Standards Act itself doesn't use the work week or the pay period as the metric for minimum wage. It does as to overtime, but it specifically references hourly wages and hours when you get into minimum wage issues. And the appellant's argument here, we believe, furthers the interests of the Fair Labor Standards Act. Fair pay for the hours worked. Essentially, what the respective sheriffs are advocating here by virtue of averaging is to take money that the appellants actually earned for working and throw it over here to the other uncompensated hours to offset it. But they're still paying $0 per hour for the uncompensated work. It doesn't logically float that there is that ability of an employer. Just like we had mentioned in Olson. Olson says you can't basically alter the records in order to bring compliance, and that's exactly what averaging would do. You're essentially altering the employment records to show payment for hours that have actually never been paid. And it's the appellant's position that that does not meet the FLSA standards, particularly when it's a statute that is to be so liberally construed in favor of the employees. So the issue here is one of fairness, compliance with the FLSA, and sticking to what the ultimate purpose of the Act was, which is to compensate each hour, a minimum hourly wage. And so for purely hourly employees, we would ask the court to find a minimum wage violation if each discrete hour is not compensated. I'm looking at Douglas. They were hourly employees. In fact, they didn't have a standard hourly rate. They got $9.04 per hour for certain things. They got another rate per hour from $9 to $15 per hour. They were not just hourly employees. They had different hourly rates depending on the task, you see. So Douglas was hourly employees, just like this case. And in fact, several of these cases, I'm not understanding your argument about why if they're hourly employees it makes a difference to the outcome. I think it's because of exactly what the Ninth Circuit had said, that you shouldn't be allowed to take earned money from one pot and put it over to cover what is a violation for payment of zero for other hours. That's the argument. And the difference is with the recent Ninth Circuit case, they were paid many different structures. Here there is not that kind of pay structure. There's one hourly rate. So it's much more simple. The Ninth Circuit case, as Your Honor pointed out, has many different pay structures. I'm just responding to what you say, that this is the only case that deals with an hourly employee. That's not correct. Other cases have people that were paid on an hourly basis. On an hourly basis, but perhaps I misspoke, Your Honor. What I should have said is that where they are paid purely hourly using only one metric of the hour, whereas the Ninth Circuit had several different, as you pointed out. I can go back to the other ones, too. We had some hourly people, too. But anyway, that's neither here nor there. Why should we not reach this issue and just say, even if you add up everything, because I gave him 30 minutes for donning and duffing both times. I gave him whatever he said his commute was. I actually doubled it. And I still couldn't get to a wage violation if you average. Is that correct? If you average, nobody's got enough. It's like you've got to come up with 200 hours more in a pay period. That's correct, and that's not an issue. I mean, like for a two-week pay period, you have to come up with 200 more hours to even get, because they make $32, to get a wage violation. Correct, Your Honor. That's correct. So really, even all these other 28 people, if you do hourly here, it kills the case. It's about 64, but the result's the same, yes. If you apply averaging here, it would. For everybody, it's just because the hourly wage is $32. Yes, and I didn't do the math on the other ones as well, but I believe you're correct that it would. Well, because I came up with it have to be over 100 hours. Nobody's got that. Correct. The concern is more of a public policy issue with these deputies, we will concede, get paid fairly well, somewhere between $20 and $35 an hour, depending on, of course, what their rank and experience is. But if the court finds averaging appropriate here, what will happen with a $10-an-hour employee or people that are not in the same financial circumstances as these other deputies? And I think that that is where this case presents potentially danger of allowing averaging to continue, because it will allow the employer unfettered discretion to take money that's earned and put it elsewhere. It allows the employer not to pay for certain hours and get away with it. Absolutely correct, Your Honor. That's exactly what averaging does. The employee has essentially a contract with the employer to work a certain number of hours and does. And then for other hours that are worked but not paid, they're getting zero because the earned rate gets reduced, which would be a breach of contract. And one thing the court may be thinking is, well, why didn't you bring a breach of contract claim or unjust enrichment? Well, we did. But in this instance, it's against the sheriff's office, and we ran into sovereign immunity issues. So as deputies, they're kind of caught between a rock and a hard place on that. And we would also submit that to the extent that there's overtime, the overtime claim is obviously more valuable. But this gets into the case where somebody doesn't work 86 hours. They work 80 hours. And then there's five uncompensated. Well, shouldn't they be getting at least the minimum wage for the five uncompensated hours? That's really what the minimum wage claim is about. It's not about double-dipping for the overtime. So I want to make sure that that's clear for the court. What we're talking about is essentially what's often referred to as gap time. So it's the appellant's position that averaging should be rejected in favor of requiring compliance for purely hourly employees for each discrete hour and to not allow the employer unfettered discretion to compensate for its violations by borrowing money earned for other tasks and hours worked. Let me ask you about the statutory language with regard to this argument, because I thought this is how all these circuits ended up where they have ended up. It shall pay to each of these employees who in any work week is engaged in commerce not less than 7.25. They seem to use that statutory language of in any work week, saying we're not looking at an hour-by-hour basis. We're looking at a work week. That seems to be how this wealth of authority has developed. Is that correct? I believe that's correct, Your Honor. They look at the text of the statute. I believe that's correct. They say, well, if you want to do it different, you need to change the statute. But I think that the reading of it may be slightly off, though, because what that language says is that if the employee does work in a work week, he or she is then covered by the act. It's not saying that the work week is the metric used to determine minimum wage violations. No, it does say that. Who in any work week is paid not less than 7.25 per hour. Anyway. I think that's... That's how they get on this track of averaging. Correct. I see that I'm almost out of time for the reasons stated in the briefing and argued here today. We respectfully ask the court to reverse and remand both cases.  The next case is Benz v. Crowley.